# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 3, 2008 Session

## STATE OF TENNESSEE v. TORIAN DILLARD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-02933      W. Mark Ward, Judge**

---

**No. W2007-00911-CCA-R3-CD  - Filed August 11, 2008**

---

The defendant, Torian Dillard, was convicted of aggravated kidnapping and sentenced to twenty years as a Range II, violent offender. He argues that the trial court erred by allowing the victim to testify with her back to him and by reseating a juror against whom he had exercised a peremptory challenge. He also contends that the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Lance R. Chism (on appeal) and Cornelius K. Bostick (at trial), Memphis, Tennessee, for the appellant, Torian Dillard.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

**State's Proof**

Memphis Police Officer Timothy Barnes testified that on November 4, 2002, he responded to an armed party call at a gas station on South Parkway. When he arrived at the gas station, he saw the defendant sitting in the passenger's side seat of a green Grand Am automobile. He drew his weapon and instructed the defendant to raise his hands and step out of the car. He patted down the defendant and detained him in the back of his car while he interviewed the victim. Officer Barnes spoke with the victim, Carla Taylor, who appeared upset and told him the defendant had a gun, had

threatened her, and would not allow her or the other passenger, Kimberly White, to leave the car. He also spoke to White, who told him that the defendant had a gun and had threatened her. Officer Barnes searched the car and found a loaded nine-millimeter handgun underneath the passenger's seat. The defendant was placed under arrest.

Memphis Police Officer Michael Rosario testified that on November 7, 2002, he responded to a kidnapping call at the Goodwill Village Apartments. He spoke with the victim's sister, Shaneka Taylor, who appeared "[v]ery distraught" and "nervous" and told him that the victim had been kidnapped by her boyfriend, the defendant. Taylor said that the defendant had been walking back and forth to the front and rear of her apartment with his hand under his shirt, as if he were carrying a weapon. Officer Rosario also spoke with Kimberly White, who provided a similar account of the events. On cross-examination, he testified that White and Shaneka Taylor did not tell him they saw the defendant carrying a weapon.

Kimberly White testified that she had been friends with the victim for approximately ten years. She met the victim on November 4, 2002, to go shopping. On the way to the store, the defendant called the victim and asked her to pick him up. She agreed and drove to his apartment. After the defendant got into the car, he asked White if she was a "whore" and began arguing with the victim. This made White uncomfortable, and she asked to be let out of the car at a gas station. At the gas station, the victim got out to pay for the gas while White remained in the car with the defendant and used her cell phone to call for a ride home. The victim returned to the car, pumped the gas, and then went back inside the store. The defendant followed her and then quickly returned to the car. Several minutes later the police arrived, and the defendant asked White if she had called the police. White replied in the negative, exited the car, and walked into the store, where the victim told her she had called the police because she had seen the defendant with a gun. White said that, when the defendant was placed in the patrol car, he called the victim and asked her why she had called the police on him. The victim handed the phone to White, and the defendant told her that he had just been released from jail and asked her to "take the charge for the gun" so he would not go back to jail. Over the next several days, the defendant repeatedly called the victim, asking her to call his family and help get him out of jail. He also called White's house asking if the victim was there.

On November 7, 2002, White accompanied the victim as she drove to Wal-Mart. The victim received a call from the defendant, who told her by which objects she was passing and on which streets she was driving. When they arrived at Wal-Mart, the victim refused to exit the car because she believed the defendant was following her. They drove back to the Goodwill Village Apartments, where White and Shaneka Taylor lived. Although the victim was staying with her sister, she parked her car in another part of the complex, closer to White's building, to try to hide her car. White went alone to her apartment and received a phone call from her neighbor, asking her to inform the victim that the defendant was outside. White did so, then looked out her window and saw the defendant in the victim's car, pulling items from the glove compartment and looking in the backseat and trunk. The victim went to her car and confronted the defendant. White heard the defendant tell the victim to get the keys to her car from White. The defendant and the victim came to White's apartment and knocked on the door, but White refused to open it. The defendant and the victim returned to the

parking lot, got into a car, and left. White called the victim's cell phone and asked if she wanted her to call the police. The victim responded in the affirmative. White asked the victim where she was going, and she responded that she did not know. The victim told White that the defendant and his mother were in the car with her. White heard the victim ask the defendant's mother to let her out of the car, but the defendant instructed his mother to keep driving. The phone disconnected, and White called the police.

On cross-examination, White testified that the victim got into the front seat of the two-door car, then moved her seat forward to allow the defendant to enter the backseat. She acknowledged that she gave a statement to the police that the defendant pushed the victim into the backseat and that she previously had been convicted of theft.

Memphis Police Lieutenant Donald Crowe testified that he was the felony response officer assigned to investigate the victim's kidnapping. He took a statement from Kimberly White, then sent patrol officers to the defendant's mother's house to attempt to locate the defendant and the victim. The officers did not locate either but found the victim's cell phone and purse in the defendant's mother's car. Lieutenant Crowe and his team of three detectives drove to the defendant's father's residence in the New Salem Manor Apartments, arriving around 3:00 a.m. They knocked on the front door but received no response. Lieutenant Crowe moved to the rear of the building, looked through a window, and saw the defendant and the victim lying in bed. He knocked on the back window, and the two woke up and walked from the bedroom into the hallway without answering. He called the defendant's cell phone but received no response.

Lieutenant Crowe became concerned because the defendant was aware that the police were present but refused to speak with them. After two hours of knocking on the doors, he declared a hostage situation, called in a tactical unit and hostage negotiators, and evacuated neighboring apartments. At approximately 6:40 a.m., the door to the defendant's father's apartment opened and the victim stumbled out. Thereafter, the hostage negotiators convinced the defendant to leave the apartment. Lieutenant Crowe testified that after the victim left the apartment she was "very withdrawn" and "[v]ery quiet." He opined that she minimized the events of that night and the actions of the defendant in the statement she subsequently gave him. He said these behaviors were common in victims of domestic violence.

On cross-examination, Lieutenant Crowe testified that he never saw the defendant or the victim between the time they awoke and left the bedroom and the time the victim left the apartment. He acknowledged that the victim told the police that she went back to sleep after being awakened by them. He testified, however, that he did not believe this statement because the officers were constantly making noise and attempting to communicate with her and the defendant.

The victim testified that she ended her relationship with the defendant shortly before this offense. She stated that on November 4, 2002, she was driving with Kimberly White when the defendant called and asked her for a ride to his mother's house. She picked him up, and he got into the front passenger seat, turned to White, and asked if she was a "whore." The defendant began

arguing with the victim and told her to make White leave the car. She pulled into a gas station, went inside the store, and asked the cashier to call the police because she was afraid of the defendant. The defendant came into the store and told her, "It's fixing to end." The police then arrived and arrested the defendant.

After the defendant went to jail, the victim stayed with her sister, Shaneka. She received numerous phone calls from the defendant over the next several days. The defendant asked why she wanted to leave him and told her that he was following her and could see her. The victim testified that these phone calls made her "uncomfortable" and "scared."[1] On November 7, 2002, she returned to her apartment complex with Kimberly White and attempted to hide her car in the parking lot. The victim later received a call from White that the defendant had opened the trunk of her car. She went outside, and the defendant approached her and tried to make her leave with him. He kept his hands in his pockets while speaking to her, causing her to believe he had a gun. The two went to White's apartment and the defendant knocked on the door, asking for the keys to the victim's car. When White refused to answer the door, the defendant continued to attempt to convince the victim to leave with him and began "nudging" her toward a car driven by his mother. She got into the front seat, and the defendant got into the back seat.

While the defendant's mother, Brenda Love, was driving, the victim received a call from Kimberly White. She responded affirmatively when White asked if she should call the police. The victim asked to be let out of the car and, as the defendant's mother prepared to pull over to let her out, the defendant began "messing with" the keys and the gear shift. The defendant asked Love to tell the victim about his having shot through his ex-girlfriend's bedroom window and then said, "I'm fixing to kill this bitch."

Love stopped the car at the defendant's father's house. The defendant exited the car and instructed the victim to follow him. She initially refused because she feared that he was carrying a gun. However, he allowed her to search him for weapons, and when she found that he was not carrying one, she accompanied him into the apartment. She stated that she left her cell phone and purse in Love's car because she was scared and "[d]idn't want him going through it." When they entered the apartment, they talked and later went to sleep. The victim and the defendant were awakened by the police knocking at the window. They got out of bed and went into the hallway, where the victim told the defendant she intended to leave. He instructed her not to open the door because the police would come inside and kill him. She remained in the apartment until the next morning, when she told the defendant she needed to leave to pick up her children. She went to the door and the defendant pushed her outside and closed the door behind her.

On cross-examination, the victim acknowledged that she told the police she intended to talk with the defendant that day and thought that she, the defendant, and Love were going to Love's house to talk. She stated that when she got into Love's car, she told her she wanted to go. She

---

[1]At this point, the trial court took a recess and the victim was relocated, over defense objection, from the witness stand to a chair near the jury box.

testified that when they entered the defendant's father's apartment, the defendant went to the back of the apartment and left her up front. However, she denied that he took a bath while she was up front and said that he was only in the back for "probably a minute." She said she "probably could have tried" to leave while the defendant was in the back but was hesitant to do so because she was uncertain what the defendant would do.

The victim acknowledged that she had consensual sex with the defendant more than once while at his father's apartment. She stated that during and after they had sex, she wanted to be at the apartment with the defendant because they "had made up." She testified that she left the apartment of her own free will and that the defendant's father did not prevent her from leaving. She further acknowledged that she visited the defendant "[a] couple" of times after he was arrested for this offense and refused to show up for a preliminary hearing in this case because she did not want the prosecution to go forward. She denied that she and the defendant moved in together after this offense but acknowledged that they had spent three or four nights together.

**Defense Proof**

Brenda Love, the defendant's mother, testified that she was interviewed by Detective Carson while the defendant and victim were missing. She said that on November 7, 2002, she picked up the defendant around 6:30 p.m. and drove him to her house. She then went to visit her mother, and when she returned home, she found the defendant standing in the street. She picked him up, and he asked her to drive him to north Memphis. En route, the defendant called the victim. Love and the defendant arrived at an apartment complex, and the defendant instructed her to pull to the side and wait for him. Love saw the defendant standing in the doorway of the apartment complex and speaking to some young women, including Shaneka Taylor. Eventually, the defendant and the women parted ways, and one of the women told Love, "[Y]ou need to take your son back home before he goes back to jail." Love drove across the parking lot and saw the defendant and the victim talking. The victim then went to an upstairs apartment, came back downstairs, and walked to Love's car. Love asked the victim if she would like to sit in her car, and she did so. They talked and the defendant subsequently joined them and sat in the backseat. Love asked the victim if she was going with them, and she replied yes.

Love then drove to the defendant's father's apartment. She testified that the victim never used her cell phone during the drive. When they arrived, the defendant and the victim got out of the car, and the victim patted down the defendant. Love testified that they were laughing and playing around. After a short time, the defendant motioned to Love that she could leave, and she drove home. Later, the police arrived at her home and asked if the defendant and victim were present. Love told them that she had taken them to the defendant's father's apartment. She attempted to call the defendant, his father, and the victim but could not reach them. She told the police that the victim had left her cell phone and purse in her car and offered to take the police to the defendant's father's apartment. Instead, the police brought her to the police station and questioned her.

-5-

On cross-examination, Love testified that on the day of the offense, she would not let the defendant use her car and told her father that she was concerned about what the defendant might do. She denied that, during the drive to the defendant's father's apartment, the victim asked to be let of the car or that the defendant "messed with" the gear shift. She testified that while she was at the police station waiting to be interviewed, Detective Carson received a phone call informing her that the defendant and the victim had been found and were not responding to the police. She denied, however, that upon hearing this news she fell to the floor and said, "[O]h, my God. He's killed her and he's killed himself."

**State's Rebuttal Proof**

Former Memphis Police Officer Monica Carson testified that she interviewed Brenda Love on the morning of November 8, 2002. She asked Love where the defendant and the victim were, and Love replied that she did not know. At one point, Love was sitting on a bench when Carson received a phone call informing her that the defendant and victim had been located but would not respond to knocks at the door and window. Carson testified that Love overheard this and "stood up and started being dramatic and, oh, Jesus, oh my God, oh my God, fell out on the floor. What did he do. What did he do." Carson stated that Love said, "[H]e must have killed them. He's dead. He's dead. Oh my God." Carson testified that Love subsequently changed her story and told her that she knew the defendant had the victim with him and that she thought the victim was afraid.

Following deliberations, the jury found the defendant guilty of aggravated kidnapping. The trial court found that the defendant was a Range II, violent offender and sentenced him to twenty years.

**ANALYSIS**

The defendant argues that the trial court erred in allowing the victim to testify from a chair on the floor, facing the jury box. He claims that this was an abuse of the trial court's discretion and denied the defendant his constitutional rights to due process of law, a fair trial, and confrontation of witnesses. He also argues that the trial court abused its discretion by not permitting defense counsel to exercise a peremptory challenge against one juror. Finally, he contends that the evidence was insufficient to support his conviction. The State responds that the trial court did not abuse its discretion in moving the victim to a chair on the floor and that the defendant waived his constitutional challenges to this decision by not objecting contemporaneously and is not entitled to relief under the plain error doctrine. The State also argues that the trial court properly seated the challenged juror and that the evidence was sufficient to sustain the defendant's conviction. As we will explain, we agree with the State.

**I. Seating of the Victim**

The defendant argues that it was improper for the trial court to permit the victim to testify in a chair, on the floor, in front of the jury. He argues that the trial court abused its discretion

because this seating arrangement prevented the defendant from seeing the victim's facial expressions and demeanor during her testimony.  He argues that he was greatly prejudiced by this decision because, in his view, the positioning of the victim left the jury with the impression that he was a danger from whom the victim needed protection.

The defendant also argues that the trial court's decision denied him his rights to confrontation of witnesses, due process of law, and a fair trial.  Regarding the Confrontation Clause, he contends that when the victim was moved, he, also, should have been moved so he could continue to see her eyes.  Regarding the Due Process of Law and Fair Trial Clauses, he argues that the seating arrangement removed his "physical indicia of innocence" and left the jury with the impression that he was guilty.  The defendant acknowledges that he did not raise these arguments at trial but contends that these issues are appropriately reviewed under the plain error doctrine.

At the beginning of the victim's direct testimony, counsel for the State thrice and the trial court twice asked her to speak louder.  After the trial court asked her for the second time to speak louder, the court instructed her to speak directly into a microphone on the witness stand.  Following several more questions, the following exchange occurred:

THE COURT:  You can use those if you would like.

THE WITNESS:  I can't do this.  I can't.  I can't.

[COUNSEL FOR THE STATE]:  Take your time.  Take a second.

(Brief pause.)

THE COURT:  All right.  You can ask the question again.  Are you ready to answer another question?

THE WITNESS:  (Inaudible.)

THE COURT:  Ma'am?

[COUNSEL FOR THE STATE]:  Can we take a recess, Judge?

THE COURT:  Let's take a five minute recess.

. . . .

[COUNSEL FOR THE STATE]:  Do you want me to try to voir dire the witness and see if this might help her, Judge, or –

THE COURT:  Why don't you try that[?]  That might be a great idea.

[COUNSEL FOR THE STATE]: Carla, we don't have – you know, the jury's not in here any more.

THE COURT: Can you look up, ma'am?

[COUNSEL FOR THE STATE]: May I approach the witness, Judge?

THE COURT: Yes.

[COUNSEL FOR THE STATE]: Carla?

THE WITNESS: Huh?

[COUNSEL FOR THE STATE]: The jury's not in here any more. Do you think maybe if you take a quick break you'll be able to do this thing?

THE WITNESS: I been trying, but I been putting this behind me. I been trying to get this behind me. I ain't –

[COUNSEL FOR THE STATE]: Okay. Do you think maybe if you took five minutes and just thought about things and calmed down a little bit things might be better?

(Brief pause.)

[COUNSEL FOR THE STATE]: Do you want a little time with yourself in the room just to think about things and calm down?

THE WITNESS: I'm tired. I'm ready for it – I really want it to be over.

[COUNSEL FOR THE STATE]: I know but the way we get it over with is to get through this.

. . . .

THE COURT: Why don't you just stand up and walk around a little bit, right here a second so I can look at this chair anyway. All right? You don't mind, do you?

THE WITNESS: Uh uh.

. . . .

[COUNSEL FOR THE STATE]: I think, Judge, as long as I'm allowed to approach the witness, Miss Taylor says she feels stronger. I think part of the problem is – I don't glances or grimaces [sic] or whatever from the defendant toward Miss Taylor.

THE COURT: Well, he's not out. We need to get him out. Let's bring out the defendant.

(The defendant was brought into the courtroom.)

(Brief pause.)

THE COURT: Let's bring the jury back in.

[DEFENSE COUNSEL]: Your Honor, could we have – just for purposes of the record just to explain why she's sitting where she's sitting.

THE COURT: Sure. I'm going to explain that, for purposes of the record, that she's sitting right in front of the jury box at a microphone that's one of the only microphones we have available. We have other microphones, but the position – she has to turn her back to the jury up there, which is one of the main reasons I wanted to bring her down here so maybe she wouldn't have to turn her back to the jury. And so I was wondering if there's some way you can get a little straighter so –

THE WITNESS: What you mean? Like this?

THE COURT: Yeah. So –

THE WITNESS: Then I won't – when he question[s] me –

[COUNSEL FOR THE STATE]: Do you want me to get over here for you? How's that?

THE COURT: And we're doing it because we're trying to get the voice amplified despite my repeated requests to get the voice amplified we couldn't do it and also apparently the witness seems more comfortable and we're trying to make her comfortable some way and at least we can get some testimony. You're welcome to add anything else.

. . . .

[DEFENSE COUNSEL]: Your Honor, maybe I should have brought this up outside the presence of the jury and I don't know – this is – I'm objecting to this upon the

basis that maybe in a way this is helpful to the State that the witness is sitting in a chair on the floor as opposed to sitting in the witness stand.

I'm objecting to where she's placed and if we need to get something mechanical to get the microphone working – I'm objecting upon the basis I think this is highly helpful and maybe prejudicial to my client.

THE COURT: Okay. I don't really see it as being prejudicial. It might be helpful in the sense that the jury can hear what the witness is saying, but --

[DEFENSE COUNSEL]: And it's sympathetic. It may engender some sympathy from the jury by her sitting so close.

THE COURT: Okay. Well, . . . I think I will overrule your objection.

## A. Abuse of Discretion

The defendant argues that it was an abuse of discretion for the trial court to allow the victim to testify from a chair on the floor, facing the jury. A trial court has broad discretion in controlling the conduct of a trial. Pique v. State, 480 S.W.2d 546, 550-51 (Tenn. Crim. App. 1971). The court is responsible for every aspect of the trial. State v. McCray, 614 S.W.2d 90, 93 (Tenn. Crim. App. 1981). Exercise of that discretion will not be disturbed except where an abuse is clearly demonstrated. Cole v. State, 512 S.W.2d 598, 602 (Tenn. Crim. App. 1974). Put another way, "[a]n appellate court should not reverse for 'abuse of discretion' a discretionary judgment of a trial court unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996).

The defendant has cited no authority for the claim that it was an abuse of discretion to allow the victim to testify outside of the witness stand. The record reflects that the trial court and counsel for the State repeatedly asked the victim to speak more loudly during her testimony. At the defendant's motion for new trial hearing, the trial court stated that it made the decision to move the victim because the court was "very, very frustrated" that her voice was so soft and wanted to make sure the jury could hear her testimony. As we have set out, trial courts are afforded broad discretion in controlling the conduct of a trial. The record does not support the defendant's claim that the trial court abused its discretion in the seating of the witness.

## B. Right to Confrontation

The defendant also argues that the trial court's decision violated his right of confrontation of witnesses. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

Article I, section 9 of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face."

The Confrontation Clause provides criminal defendants: (1) the right to physically face the witnesses who testify against them and (2) the right to cross-examine the witnesses. State v. Maclin, 183 S.W.3d 335, 343 (Tenn. 2006), abrogated on other grounds as stated in State v. Cannon, __ S.W.3d __, 2008 WL 1868010, at *10 (Tenn. 2008). With respect to the former right, our supreme court has stated that "[t]he 'face to face' language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution." Id. (citation omitted).

The defendant acknowledges that he did not object contemporaneously on this basis but asserts that the trial court's decision was plain error. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. Crim. P. 52(b). In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court adopted the test for plain error first announced by this court in State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). In order for us to find plain error, Adkisson requires that "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

We decline to review this claim for plain error because the record does not clearly establish what occurred in the trial court. Although the record reflects that the victim testified in a chair on the floor, facing the jury, the record does not disclose where the defendant was seated in relation to the victim. Therefore, we cannot determine whether, as the defendant claims, he could not see the victim's eyes while she testified. Moreover, the record does not reflect that the defendant requested to be repositioned so he could see the victim's face. Because the defendant has not clearly established that he was not "face to face" with the victim, our analysis need go no further.

## C. Rights to Due Process of Law and a Fair Trial

Finally, the defendant claims that the trial court's decision in moving the victim denied his rights to due process of law and a fair trial. He again acknowledges that he did not lodge a contemporaneous objection on these grounds but argues that we should review the claim for plain error.

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Article I, section 8 of the

Tennessee Constitution states that "no man shall be . . . in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

The defendant argues that the trial court "removed [his] 'physical indicia of innocence'" by permitting the victim to testify with her back to the defendant. Again, we may not appropriately analyze this claim under the plain error doctrine because the record does not clearly establish what occurred in the trial court. At the hearing on the motion for a new trial, the trial court stated:

> Her back, in generally, [sic] was turned to the defendant. I think that the record will show that. Now, as to whether it was a 45 degree, 30 degree, 90 degree and she probably moved her head throughout the proceeding, too. So the extent to what they, you know, how much of her face he saw, I don't have a clue.

As the trial court stated, the record does not clearly establish what occurred at trial.[2] The defendant is not entitled to plain error review of this claim.

## II. Jury Selection

The defendant next argues that the trial court erred in not permitting him to exercise a peremptory challenge against a juror designated juror number six. The trial court seated the juror after finding that the State had established a *prima facie* case of purposeful racial discrimination, and the defendant had not offered a legitimate race-neutral reason for the peremptory challenge. The defendant argues that the trial court erred in finding that his reason was not race-neutral. The State responds that the trial court properly seated the juror.

The Equal Protection Clause of the Fourteenth Amendment forbids the State and criminal defendants from challenging potential jurors solely on account of their race. Batson v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986); Georgia v. McCollum, 505 U.S. 42, 59, 112 S. Ct. 2348, 2359 (1992). The party raising the Batson claim bears the initial burden of making out a *prima facie* case of purposeful discrimination. Batson, 476 U.S. at 93-94, 106 S. Ct. at 1721. If a *prima facie* showing is made, the burden shifts to the proponent of the strike to offer a race-neutral reason for the challenge. Id. at 97, 106 S. Ct. at 1723. This explanation need not be persuasive or plausible. Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995). If a race-neutral explanation is offered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. Id. at 767, 115 S. Ct. at 1770-71.

---

[2]Moreover, it is not evident that a clear and unequivocal rule of law has been breached. The defendant analogizes to Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976), where this court held that it was reversible error to try the defendant in shackles without a clear showing of necessity. The court stated that "[i]ncluded in the presumption of innocence, which is mandated by due process and which attaches in each criminal case, is the defendant's right to the 'physical indicia of innocence.'" Id. at 820. However, we do not believe that allowing a witness to testify on the floor facing the jury is analogous to trying a defendant in shackles.

The trial court may not simply accept a proffered race-neutral reason at face value but must examine the proponent's challenges in context to ensure that the reason is not merely pretextual. State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006). If a trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. Id. at 369. "'[D]etermination of the [proponent's] discriminatory intent or lack thereof turns largely on the evaluation of the [proponent's] credibility, of which the attorney's demeanor is often the best evidence.'" Id. (quoting State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994)). Accordingly, we afford great deference to a trial court's findings in this regard and will set them aside only if clearly erroneous. Id.

During *voir dire*, the State and the defendant were given six peremptory challenges. After the first round of strikes, the State raised a Batson objection because five of the six jurors struck by the defendant were white. The trial court required defense counsel to articulate in writing his reasons for excluding each juror. The following exchange occurred outside the presence of the venire:

[COUNSEL FOR THE STATE]: Judge, we're – the State has raised a Batson objection because five of the six jurors that [defense counsel] submitted in his peremptory challenges in the first round were white.

[Defense counsel] has now listed in the margin his quote, unquote, race neutral reasons for striking those individuals.

There are at least three, Judge, and I would have to see that list to tell you which one – which ones, that quite frankly, I do not think [defense counsel] has set forth a valid race neutral reason. I don't think they're reasons at all, and I would ask, your Honor, I would like to continue my objection.

[DEFENSE COUNSEL]: Your Honor, in response to juror number six, . . ., basically Your Honor, my main – my only reason is that my client simply – he just didn't want this particular person sitting on the jury. It wasn't anything – it was just from the moment [juror number six] took the jury box, he just told me right away, I do not want this person on my jury.

THE COURT: Okay. Let's stop right there.

[COUNSEL FOR THE STATE]: I submit, Judge, that's no reason at all. Basically, what [defense counsel] is putting forth is I don't have a reason. [The defendant] just doesn't want him on the jury.

That's exactly what Batson is supposed to protect against. It doesn't just – Batson doesn't just apply to [defense counsel]. It applies to [the defendant].

You can't just strike somebody for no reason at all in a pattern that is racial. What we have is a pattern that is racial, five out of six, and what amounts to no reason at all. And I would ask Your Honor to affirm my objection, sustain my objection with regard to that one.

THE COURT: Well, I am finding a pattern enough to raise the requirement that you come up with race neutral reasons. I do think that as far as that initial Batson thing that five out of six, some of which don't make a lot of sense to me, and some of these really don't make a lot of sense considering the rest of the people that are coming up on the list, but . . . be that as it may, the only thing you have on [juror number six] is your client just doesn't want him?

Counsel and the trial court then discussed defense counsel's remaining peremptory challenges. The trial court subsequently ruled that juror number six would remain seated: "Well, I've already decided I'm not going to allow the excusing of [the juror]. I'm going to let him stay on the jury. I don't think that we've been given any race neutral reason with regard to [the juror]."

We decline to set aside the trial court's finding in this regard. The defendant's proffered "reason" for excluding [juror number six] – "I do not want this person on my jury" – is not a reason but rather a statement that he wished to use a peremptory strike against [the juror]. Without further explanation of *why* the defendant did not want [the juror] to serve, the trial court could not find that the defendant had offered a race-neutral explanation. Therefore, there was no need for the trial court to perform the third step of Batson's analysis and determine whether the State had proven purposeful racial discrimination. The defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

Finally, the defendant challenges the sufficiency of the evidence supporting his conviction. He argues that "due to the victim's inconsistent statements," no reasonable juror could have concluded that the defendant unlawfully confined the victim inside his father's apartment or Love's car. He further contends that no reasonable juror could have concluded that the defendant intended to terrorize the victim.

Where sufficiency of the convicting evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated kidnapping may be committed by several means. The defendant was convicted of the knowing, unlawful confinement of the victim so as to interfere substantially with her liberty, with the intent to terrorize her. See Tenn. Code Ann. § 39-13-304(a)(3) (2006).

Viewed in the light most favorable to the State, the proof at trial shows that the victim called the police from a gas station three days before the offense because the defendant had a gun and she was afraid of him. When the defendant was released from jail, he began following the victim and calling her repeatedly, which made the victim feel "uncomfortable" and "scared." On November 7, 2002, the victim rode in Love's car with the defendant, who at one point told Love, "I'm fixing to kill this bitch" and bragged about firing a gun into the home of an ex-girlfriend. The victim asked to be let out of the car but was not. When the victim and the defendant arrived at the defendant's father's apartment, the victim left her cell phone and purse in Love's car because she was scared. At the apartment, the victim told the defendant she intended to leave, but the defendant instructed her not to open the door.

We conclude this evidence was sufficient for a rational jury to find each of the elements of aggravated kidnapping, including that the defendant intended to terrorize the victim. The defendant's claim regarding "the victim's inconsistent statements" is an argument that the jury erred in its credibility determination. However, we conclude that, based upon the evidence, a reasonable jury could have made this determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE